# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

        Plaintiff,

v.

Jose Ramone Navarrete-Rivera,

        Defendant.

Case No. 22-cr-0052 (DWF/JFD)

**REPORT AND RECOMMENDATION**
**and**
**ORDER**

---

This case is before the undersigned United States Magistrate Judge on Defendant Jose Ramone Navarrete-Rivera's Motion to Disclose Informant (Dkt. No. 19), Motion to Suppress Evidence (Dkt. No. 21), and Motion to Suppress Statements (Dkt. No. 22). The nondispositive motion is before the undersigned Magistrate Judge for disposition by Order, and the dispositive motions have been referred for a Report and Recommendation, pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Mr. Navarrete-Rivera's Motion to Suppress Evidence (Dkt. No. 21) and Motion to Suppress Statements (Dkt. No. 22) be denied. The Court also orders that Mr. Navarrete-Rivera's Motion to Disclose Informant (Dkt. No. 19) be denied.

## I.    Background

The Court held a motions hearing on September 7, 2022. Assistant U.S. Attorney Joseph Teirab represented the United States. Assistant Federal Defenders Douglas Olson and Sarah Weinman represented Defendant Jose Ramone Navarrete-Rivera. One witness, Minnesota Bureau of Criminal Apprehension ("BCA") Special Agent Anthony Fletcher,

testified. The Court received three exhibits from the United States: (1) an audio recording of an interview of Mr. Navarrete-Rivera (Gov't Ex. 1); (2) a transcript of the recorded interview (Gov't Ex. 1A); and (3) an affidavit sworn by Agent Fletcher (Gov't Ex. 2) in support of his application to a Minnesota state court for a warrant to search Mr. Navarrete-Rivera's Minneapolis apartment. Following the hearing, further briefing was submitted by Mr. Navarrete-Rivera (Dkt. No. 49) and the United States (Dkt. No. 50).

Mr. Navarrete-Rivera moves to suppress all evidence seized in a warranted search of his apartment on May 14, 2021 on the grounds that Special Agent Fletcher's affidavit submitted as part of the application for that warrant lacked probable cause for four reasons: (1) a lack of information establishing the reliability of a confidential informant ("CI"); (2) a lack of nexus between Mr. Navarrete-Rivera's apartment and criminal activity or contraband; (3) a dog sniff of the exterior door of Mr. Navarrete-Rivera's apartment was insufficient evidence to establish probable cause to search inside the apartment; and (4) conducting the dog sniff was unconstitutional. (Def.'s Post-Hr'g Mem. Supp. Mot. Suppress at 1, Dkt. No. 49.) Mr. Navarrete-Rivera further argues that if the warrant is invalid, it cannot be saved by the good-faith exception to the exclusionary rule articulated in *Leon v. United States*, 468 U.S. 897 (1984), as that exception does not apply.

Mr. Navarrete-Rivera also moves to suppress a statement he made to law enforcement officers during the execution of the warrant, arguing that he requested counsel during the custodial interrogation but that the officers did not cease the interview. (Def.'s Post-Hr'g Mem. at 1.) Mr. Navarrete-Rivera submits, therefore, that the statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that any waiver of

2

his *Miranda* rights was not voluntary, knowing, and intelligent. (Def.'s Post-Hr'g Mem. at 1–2.) Alternatively, Mr. Navarrete-Rivera asks that the statement be suppressed as a fruit of an illegal search warrant. (*Id.* at 2.)

Finally, Mr. Navarrete-Rivera moves to compel the disclosure of the CI's identity. (Def.'s Post-Hr'g Mem. at 13–17.)

### A.    The Search Warrant Affidavit

Government Exhibit 2 is an affidavit Agent Fletcher submitted in support of an application for a search warrant for Mr. Navarrete-Rivera's apartment, described as Apartment # 13xx, 95 South 10th Street in Minneapolis, Minnesota 55404, including any assigned storage areas, lockers, or garage spaces. (Gov't Ex. 2 at 2.) The items to be seized included illegal narcotics, drug paraphernalia, currency, scales, writings or mailings indicating occupancy, "owe sheets" and other documents indicating co-conspirators, and documents evidencing monies from drug trafficking. (*Id.* at 1.) Agent Fletcher believed these items had been used to commit a crime, were intended to be used to commit a crime, or were evidence of a crime. (*Id.* at 2.)

Agent Fletcher began his affidavit by describing in general terms an ongoing criminal investigation that was being conducted by the BCA, the West Metro Drug Task Force ("WMDTF"), and the Drug Enforcement Administration ("DEA") of a large-scale drug trafficking organization ("DTO"). (*Id.* at 2–3.) Agent Fletcher also wrote in his affidavit that "The suspect(s) in this investigation is" Mr. Navarrete-Rivera. (*Id.* at 2.)

During the 72 hours before Agent Fletcher applied for the warrant, he and other law enforcement officers had executed a search warrant on another suspected member of the

3

DTO, resulting in the seizure of methamphetamine, cocaine, and currency. (*Id.* at 3.) Officers *then*[1] interviewed a CI, who said they knew of a person named "Jose Ramone Navarrete Rivera," who was involved in selling and distributing large amounts of methamphetamine. (*Id.* at 3–4.) The CI also provided a picture of "Jose Ramone Navarrete Rivera." (*Id.* at 4.) The CI told the officers that Mr. Navarrete-Rivera "lived at the 'Club West' apartments in Minneapolis on the 13th floor." (*Id.* at 4.)

Agent Fletcher searched law enforcement databases and discovered a person named "Jose Ramone Navarrete Rivera," who lived at Apartment #13xx, 95 South 10th Street, Minneapolis, Minnesota, the "City Club" apartments. (*Id.*) Agent Fletcher obtained a photo of "Jose Ramone Navarrete Rivera" from the U.S. Border Patrol, which matched the photo provided by the CI. (*Id.*)

Two other task force officers went to the apartment complex at 95 South 10th Street and learned that "Jose Ramone Navarrete Rivera" leased Apartment #13xx. (*Id.*) The officers told the management they were investigating Mr. Navarrete-Rivera, and "[w]ith the assistance of management," Agent Fletcher instructed the two task force officers to return to the scene and conduct a dog sniff. (*Id.*) One of the task force officers, "TFO Stenglein is the handler of a certified U.S.P.C.A.[2] narcotics detector dog named 'Kirk.'" (*Id.*) Kirk is certified and trained to detect the odor of narcotics, specifically cocaine, methamphetamine, and heroin. (*Id.*)

---

[1] The word "*then*" is italicized for emphasis because the sequence of events will be referred to again later in this Report and Recommendation and Order.

[2] Although not spelled out in the affidavit, this acronym probably stands for "United States Police Canine Association."

Officer Stenglein used Kirk to conduct a dog sniff of the exterior door of Apartment #13xx. (*Id.*) Officer Stenglein first directed Kirk to sniff several doors near #13xx, with negative results. (*Id.*) "TFO Stenglein then directed 'Kirk' to sniff the lower door seam and areas on the lower half of door #13xx and 'Kirk' immediately indicated to the presence of narcotics odor emanating from door #13xx." (*Id.*)

As a result of the investigation, Agent Fletcher believed that Mr. Navarrete-Rivera was involved in the sale and distribution of methamphetamine and the collection of currency on behalf of the DTO. (*Id.*)

**B.    The Interview of Mr. Navarrete-Rivera**

Agent Fletcher has worked in law enforcement for more than 20 years and has been a task force officer since 2016. (Hr'g Tr. at 13, Dkt. No. 45.)[3] He was present for the execution of the search warrant at Mr. Navarrete-Rivera's apartment on May 14, 2021, which occurred at approximately 3:45 p.m. (*Id.* at 15.) During the execution of the warrant, Mr. Navarrete-Rivera was detained in a parking area, handcuffed, and brought to his apartment. (*Id.* at 23.) About 30 minutes into the execution of the warrant, Agent Fletcher interviewed Mr. Navarrete-Rivera in his bedroom, with DEA Special Agent "Sanchez" also present. (*Id.* at 15, 20.) The agents were wearing police attire and carrying weapons. (*Id.* at 15, 25.) Mr. Navarrete-Rivera was handcuffed but appeared "normal." (*Id.* at 25.) The door to the bedroom was closed. (*Id.* at 24.)

---

[3] The motions hearing transcript is currently filed under seal, but neither party has requested any redactions, and in this Report and Recommendation the Court has not set forth any personal identifiers or confidential information.

Agent Fletcher knew that Mr. Navarrete-Rivera spoke Spanish, but Mr. Navarrete-Rivera had conversed in English with other officers during his initial detention. (*Id.* at 17.) At the beginning of the interview, Special Agent Sanchez gave an oral *Miranda* warning in both English and Spanish, and Mr. Navarrete-Rivera was also given a written *Miranda* advisory in Spanish. (*Id.*) Mr. Navarrete-Rivera appeared to listen and understand the oral advisories and to read the written advisory thoroughly. (*Id.* at 18.) The interview was conducted in English. (*Id.* at 20.)

The Court has read the transcript of the interview (Gov't Ex. 1A) and listened to the audio recording (Gov't Ex. 1). The audio recording fills in some gaps marked "[U/I]" in the transcript, and the Court has endeavored to recount the most accurate version of the interview by referring to both exhibits.

After Mr. Navarrete-Rivera received the three *Miranda* warnings he said "Okay." (Gov't Ex. 1 at 3; Gov't Ex. 1A at 1:51.) Agent Sanchez asked Mr. Navarrete-Rivera if he understood, and he said, "Yes." (Gov't Ex. 1A at 1:55.) Agent Fletcher asked Mr. Navarrete-Rivera if he wanted to continue talking after hearing his rights, and Mr. Navarrete-Rivera said he had a question. (Gov't Ex. 1 at 3; Gov't Ex. 1A at 2:05–2:11.) Mr. Navarrete-Rivera asked if he decided to talk after getting a lawyer, "would it be the same if I talk right now?" (Gov't Ex. 1 at 3; Gov't Ex. 1A at 2:13–2:20.) Agent Fletcher responded that Mr. Navarrete-Rivera had to decide right then whether to speak to law enforcement. (Gov't Ex. 1 at 4; Gov't Ex. 1A at 2:23–2:26.) Mr. Navarrete-Rivera said he "would like to talk to you guys, but then . . . I can have my lawyer too." (Gov't Ex. 1 at 4; Gov't Ex. 1A at 2:30–2:38.) Agent Fletcher said, "No, I'm not going to wait for a lawyer.

You can talk to us now without a lawyer, or we can -- you can go to jail, get a lawyer and talk to us at another time. It's up to you." (Gov't Ex. 1 at 4; Gov't Ex. 1A at 2:41–2:49.) Mr. Navarrete-Rivera asked how else he could talk to the agents, and Agent Fletcher answered, "That depends. You've got to decide if you want a lawyer or not." (Gov't Ex. 1 at 5; Gov't Ex. 1A at 2:53–3:03.) Mr. Navarrete-Rivera then said, quietly, "I'll talk." When asked to repeat himself by Agent Fletcher, Mr. Navarrete-Rivera repeated, more firmly, "I'll talk." (Gov't Ex. 1 at 5; Gov't Ex. 1A at 3:08–3:16.) Agent Fletcher later told Mr. Navarrete-Rivera that, "at any time, you can choose not to talk with us. Okay?" (Gov't Ex. 1 at 5–6; Gov't Ex. 1A at 3:27–3:29.) Mr. Navarrete-Rivera responded, "Okay." (Gov't Ex. 1 at 6; Gov't Ex. 1A at 3:30.)

No threats or promises were made before or during the interview. (Hr'g Tr. at 16.) Mr. Navarrete-Rivera was polite and cooperative. (*Id.* at 25.) The interview ended after about 10 minutes. (*Id.* at 28.) Mr. Navarrete-Rivera was not detained or arrested afterward. (*Id.*)

## II.    Discussion

### A.    Probable Cause for the Search Warrant

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. Whether there was probable cause for the issuance of a search warrant "depends on whether, under the totality of the circumstances, there is a fair

probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)). When one court reviews another court's probable cause determinations "we pay 'great deference' to the probable cause determinations of the issuing judge or magistrate, and our inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

### 1.    Information Establishing the Reliability of the CI

Mr. Navarrete-Rivera first argues that the affidavit lacked sufficient information to establish the reliability of the CI. "When an affidavit in support of a search warrant is based upon information from an informant, the informant's 'reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause.'" *Faulkner*, 826 F.3d at 1144 (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)). The principal consideration "is whether the information is reliable." *Id.* (citing *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013)). One way to establish reliability is through independent corroboration. *Id.* (citing *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). "[I]ndependent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause." *United States v. Ketzeback*, 358 F.3d 987, 992 (8th Cir. 2004).

Here, the CI told officers that "Jose Ramone Navarrete Rivera . . . lived at the 'Club West' apartments in Minneapolis on the 13th floor." Agent Fletcher confirmed the name and partial address given by the CI by searching law enforcement databases and ascertaining that a person named "Jose Ramone Navarrete Rivera" lived at Apartment #13xx (which presumably is on the 13th floor) at the "City Club" apartments in Minneapolis. Although the name "Club West" differs from "City Club," it is sufficiently similar to indicate that the CI knew where "Jose Ramone Navarrete Rivera" lived. Agent Fletcher further corroborated the CI's information by matching the photo obtained from the CI with a photo of "Jose Ramone Navarrete Rivera" from a U.S. Border Patrol database. The Court finds that the corroborated information established that the CI was providing reliable information, and, in light of the totality of the circumstances described in the affidavit, the Court concludes that the information from the CI added to, rather than detracted from, the CI's reliability and therefore also added to probable cause.

### 2. The Nexus Between Mr. Navarrete-Rivera's Apartment and Criminal Activity or Contraband

Mr. Navarrete-Rivera next argues that the affidavit did not establish a nexus between his apartment and criminal activity or contraband. "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). The United States contends that the nexus in this case was provided by Kirk's positive indication to the presence of a narcotics odor coming from the exterior door to Apartment #13xx. The Court agrees. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container,

car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)). "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." *Sundby*, 186 F.3d at 876. Agent Fletcher's affidavit stated that Kirk is a certified narcotics detector dog—certified and trained specifically to detect narcotics. Under *Sundby*, that statement was enough to establish Kirk's reliability for the purpose of the search warrant. Moreover, Kirk's positive indication to the presence of narcotics emanating from Apartment #13xx established probable cause to believe there were drugs inside. *See Donnelly*, 475 F.3d at 955. Whether using Kirk to sniff the exterior door to the apartment violated the Constitution is addressed below.

### 3.    Information about Kirk's Training and Certification

Mr. Navarrete-Rivera next argues there was insufficient evidence from the dog sniff to establish probable cause because there is no information in the affidavit about Kirk's competency, prior performance, failure or success data, percentage of hits, and manner of indicating. As discussed above, however, that level of detail is not required. An "affidavit need only state the dog has been trained and certified to detect drugs," *Sundby*, 186 F.3d at 876, and Agent Fletcher's affidavit did.

Mr. Navarrete-Rivera also makes a staleness argument, asserting that the date of the dog sniff is unknown. Though the precise date is unknown, it is clear from the narrative of the affidavit that all of the information pertaining specifically to Mr. Navarrete-Rivera was obtained within the 72 hours immediately preceding submission of the application for the

search warrant. (*See* Gov't Ex. 2 at 3.) The affidavit's narrative begins 72 hours before the search warrant for Mr. Navarrete-Rivera's apartment was applied for with the execution of another search warrant as part of the investigation into the DTO and "*then*" law enforcement interviewed the CI. The narrative then proceeds chronologically to Kirk's positive indication. Information obtained within 72 hours of a warrant application "can hardly be deemed stale information." *See United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012) (finding that information about a controlled buy made less than 72 hours before the warrant application was not stale).

### 4.    The Constitutionality of the Dog Sniff

In 2010, the Eighth Circuit Court of Appeals considered whether "the use of a drug detection dog to sniff the exterior door frame of [an] apartment violated the Fourth Amendment's prohibition on unreasonable searches." *United States v. Scott*, 610 F.3d 1009, 1015 (8th Cir. 2010). The police were lawfully in a common hallway of the apartment building at the time of the sniff. *Id.* The court held that the dog "sniff of the apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment" because the defendant "had no legitimate privacy interest in the illegal drugs that [the dog] sniff detected." *Id.* at 1016.

Three years after *Scott*, the Supreme Court held in *Florida v. Jardines* that "using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." 569 U.S. 1, 3 (2013). Rather than the privacy rights analysis of the Eighth Circuit in *Scott*, the Supreme Court in *Jardines* reached its holding using a property-rights analysis. The Court reasoned that the officers

11

conducted the dog sniff in an area "immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself." *Id.* at 6. The Court declined to consider whether the investigation violated any reasonable expectation of *privacy* the homeowner might have had, commenting that a "virtue of the Fourth Amendment's *property*-rights baseline is that it keeps easy cases easy." *Id.* at 11 (emphasis added). "That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Id.* Justice Kagan wrote a concurring opinion in *Jardines*, which was joined by Justices Ginsburg and Sotomayor, that would have reached the same holding as the Court via a privacy rights analysis (as well as, not instead of, a property-rights analysis). Justice Kagan drew an analogy between a drug-sniffing dog and "super-high-powered-binoculars." *Jardines*, 569 U.S. at 12 (Kagan, J., concurring). Both were "super-sensitive instrument[s], . . . deployed to detect things inside that they could not perceive unassisted."[4]

Mr. Navarrete-Rivera relies primarily on *United States v. Whitaker*, 820 F.3d 849, 852 (7th Cir. 2016), a Seventh Circuit opinion that used the logic of the *Jardines* concurring

---

[4] Justice Kagan compared the use of a drug-sniffing dog on a door to the use of a thermal-imaging device aimed at a house from the street, which was the issue in *Kyllo v. United States*, 533 U.S. 27 (2001). *Kyllo* framed the issue in privacy terms. *Id.* at 33–34. The Supreme Court determined in *Kyllo* that when "the Government uses a device that is not in general public use[] to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40. But the Eighth Circuit in *Scott* explicitly rejected the argument that *Kyllo* applied to dog sniffs. 610 F.3d at 1016. "Unlike the thermal imaging technology at issue in *Kyllo*, narcotics dog sniffs are not 'capable of detecting lawful activity.'" *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Thus, dog sniffs are not comparable to thermal imaging technology; rather, they are "*sui generis*." *Id.* (citing *United States v. Place*, 462 U.S. 696, 707 (1983)).

opinion to hold that dog sniffs of the exterior doors of apartments that open onto a common hallway "invaded reasonable privacy expectations" and are therefore "searches" within the meaning of the Fourth Amendment, meaning such dog sniffs cannot be conducted by law enforcement without either a search warrant or an applicable exception to the warrant requirement. *Id.* Justice Kagan would have decided *Jardines* on privacy interests, as well as property interests, *id.* at 13, and that is exactly what the Seventh Circuit did in *Whitaker*.

But the Eighth Circuit has not extended Justice Kagan's and the Seventh Circuit's privacy-interests rationale to dog sniffs of exterior apartment doors. When presented, in *United States v. Perez*, 46 F.4th 691 (8th Cir. 2022), with the opportunity of deciding the constitutionality of bringing a detection dog into a hallway of a multi-unit apartment complex and having the dog sniff the exterior doors of apartments, the Eighth Circuit did not decide the Fourth Amendment issue, but proceeded straight to a discussion of the good-faith exception to the exclusionary rule announced in *Leon v. United States*, 468 U.S. 897 (1984). The Eighth Circuit did not analyze the dog sniff either as a physical intrusion under *Jardines* or as a violation of a reasonable expectation of privacy under *Katz*. The *Perez* court remarked that, at the time that the dog sniff was conducted, "we had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *Perez*, 46 F.4th at 697–98. Notwithstanding this language, the *Perez* court did not proceed to expressly overrule *Scott*, nor to explain the applicability of *Jardines* to sniffing doors in a common hallway. Instead, the court continued, "Based on the state of our caselaw at the time of the search, we find that the good faith exception applies. It was

reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible." *Id.* at 698.

Consequently, at the time of the dog sniff in this case, *Scott* was still the law in the Eighth Circuit. When Kirk sniffed the exterior door of Mr. Navarrete-Rivera's apartment, the Eighth Circuit had "neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *Scott* is still the law in this Circuit, and under *Scott*, a dog sniff of an exterior apartment door opening into a common hallway is constitutional. *Jardines* did not overrule *Scott*, nor could it, because *Jardines*' holding is premised on a property-rights analysis, and apartment tenants do not have a property interest in the common hallway outside their door. Mr. Navarrete-Rivera's argument appears to be that *Perez*, by proceeding directly to good faith (an exception to the exclusionary rule that only comes into play after a search has been found unconstitutional), has *sotto voce* overruled *Scott*, or at least invited lower courts in this Circuit to hold that dog sniffs of apartment doors are unconstitutional. (*Perez* also described *Scott* as "our then-applicable" precedent, a phrase that might imply that Scott was precedent *then* but is not precedent *now*.) This Court does not agree that *Perez* overruled *Scott*, although there is certainly language in *Perez* suggesting that the Eighth Circuit, or at least the *Perez* panel, might overrule *Scott* in a later case. But lower federal courts are not to anticipate what a higher court may do. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the

case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Even if the Eighth Circuit in *Perez* has quietly overruled *Scott*, the *Leon* good faith exception would spare from suppression the evidence found in the warranted search of Mr. Navarrete-Rivera's apartment. In *Leon*, the Supreme Court held that the exclusionary rule did not apply when the police obtain evidence by acting on "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916.

The *Leon* "good-faith" exception will not apply for the following four reasons:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (quoting *Leon*, 468 U.S. at 923) (cleaned up).

Mr. Navarrete-Rivera argues that *Leon* does not save the search because the warrant affidavit was so lacking in probable cause that reliance on the issuing judge's determination was unreasonable. (Def.'s Post-Hearing Mem. at 11–13.) The Court disagrees. As detailed

15

fully above, the CI provided information that Mr. Navarrete-Rivera was involved in selling and distributing large amounts of methamphetamine. The CI's reliability was established through independent corroboration. Investigating agents determined that Mr. Navarrete-Rivera lived at Apartment #13xx, 95 South 10th Street, Minneapolis, Minnesota. With the assistance of management, and shortly after obtaining the information from the CI, officers used a certified and trained dog to sniff the lower door seam and lower door area of Mr. Navarrete-Rivera's apartment. The dog indicated to the presence of narcotics, which also established a nexus between the apartment and contraband. It was reasonable for executing officers to rely on Eighth Circuit precedent that dog sniffs of an exterior apartment door are permissible. *See Perez*, 46 F.4th at 698; *Scott*, 610 F.3d at 1016. Accordingly, the Court concludes that if *Scott* has been overruled, the *Leon* good-faith exception nevertheless applies.

### B.    Mr. Navarrete-Rivera's Statement

Under the Fifth Amendment, "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. A defendant's statement made during a custodial interrogation may be used against him only if (1) he was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed"; and (2) he waives those rights "voluntarily, knowingly[,] and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

There is no dispute that Mr. Navarrete-Rivera was in custody and was interrogated by law enforcement agents. Therefore, a *Miranda* warning was required, and indeed, three

such warnings were administered: an oral warning in English, an oral warning in Spanish, and a written warning in Spanish. Mr. Navarrete-Rivera does not challenge the validity of the warnings.

Rather, Mr. Navarrete-Rivera contends that his colloquy with Agent Fletcher about a lawyer was a request for a lawyer. When an accused individual "expresse[s] his desire to deal with the police only through counsel," the individual "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Whether an individual actually invoked his right to counsel is an objective inquiry. *Davis v. United States*, 512 U.S. 452, 458–59 (1994). At minimum, the statement must be able to "reasonably be construed to be an expression of a desire for the assistance of an attorney . . . ." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459. In other words, "the suspect must unambiguously request counsel." *Id.* (holding that the statement "Maybe I should talk to a lawyer" was not an invocation of the right to counsel).

In the present case, the Court finds that Mr. Navarrete-Rivera did not unambiguously request counsel during the interview with Agent Fletcher. Mr. Navarrete-Rivera's question about whether "it [would] be the same" if he talked then or after getting a lawyer was an inquiry about his options and the potential consequences, not a request for

counsel. Similarly, Mr. Navarrete-Rivera's comment that he wanted to talk "but then . . . I can have my lawyer too" was to clarify whether the agents would postpone the interview until a lawyer was present. When Agent Fletcher then told Mr. Navarrete-Rivera that he needed to decide whether he wanted a lawyer or not, Mr. Navarrete-Rivera responded, "I'll talk." It is apparent from the context of the conversation, the tone and cadence of the conversation captured on the audio recording, and Agent Fletcher's follow-up question and Mr. Navarrete-Rivera's response that Mr. Navarrete-Rivera did not unambiguously invoke his right to counsel.

Mr. Navarrete-Rivera next argues that he did not knowingly, voluntarily, and intelligently waive his rights. The waiver inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Court considers the totality of the circumstances in assessing waiver. *Id.* The United States bears the burden of proving the validity of the waiver by a preponderance of the evidence. *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

Mr. Navarrete-Rivera argues that his waiver was coerced because the agents did not honor his request for counsel. (Def.'s Post-Hr'g Mem. at 18–19, 20.) The Court has found, however, that Mr. Navarrete-Rivera did not unambiguously invoke his right to counsel and incorporates that discussion here by reference. The Court will consider Mr. Navarrete-

Rivera's discussion with Agent Fletcher about counsel as part of the totality of circumstances surrounding the waiver of *Miranda* rights.

Agents Fletcher and Sanchez interviewed Mr. Navarrete-Rivera in his bedroom during the execution of the warrant. Mr. Navarrete-Rivera was handcuffed, and the agents wore police attire, including weapons. There was no intimidation or coercion, however, such as the brandishing of weapons. Mr. Navarrete-Rivera was advised of his *Miranda* rights three times: orally in English, orally in Spanish, and in writing in Spanish. He appeared to understand his rights and told the agents he understood his rights. In any event, Mr. Navarrete-Rivera does not challenge the validity of the *Miranda* warning.

Mr. Navarrete-Rivera then asked some questions about counsel, including whether he could speak with the agents after he got a lawyer, to which Agent Fletcher said that Mr. Navarrete-Rivera had to decide then and there whether to proceed without a lawyer or go to jail, get a lawyer, and then talk. The Court finds that Mr. Navarrete-Rivera asked about the possibility and timing of getting a lawyer to gain better awareness of his rights and the consequences of waiving them. Agent Fletcher's response provided that clarification. Although Agent Fletcher mentioned jail, he did not threaten Mr. Navarrete-Rivera with going to jail as a consequence of refusing to talk or suggest that Mr. Navarrete-Rivera would not go to jail as a benefit of choosing to talk. Rather, Agent Fletcher told Mr. Navarrete-Rivera that if he wanted a lawyer, he would have to wait in jail for one. The Court cannot conclude from the record before it that Agent Fletcher's statement was false. After the interchange, Mr. Navarrete-Rivera agreed to speak with the agents. A waiver of rights may be inferred when a suspect answers questions after receiving a *Miranda*

19

advisory. *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights.") No threats or promises were made during the interview, and Mr. Navarrete-Rivera was polite and cooperative.

The Court finds that Mr. Navarrete-Rivera voluntarily, knowingly, and intelligently waived his *Miranda* rights. Mr. Navarrete-Rivera made a free and deliberate choice to give a statement, without being intimidated, coerced, or deceived. He was fully aware of the nature of the rights being waived and the consequences of his decision.

As a final matter, Mr. Navarrete-Rivera submits the statement should be suppressed as a derivative fruit of an illegal search warrant. The Court has found, however, that the search warrant was supported by probable cause and therefore does not recommend that the statement be suppressed as a fruit of an illegal search.

### C.    Disclosure of the Confidential Informant

The United States has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61. "In a motion to compel disclosure of a confidential informant, the defendant bears the burden of demonstrating a need for disclosure." *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998). The Court must balance "the defendant's right to information against the government's privilege to withhold the identity of a confidential

informant." *Id.* When an informant is a "tipster"—meaning "a person who merely conveys information but does not witness or participate in the offense"—disclosure is "not vital to a fair trial." *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987).

Here, the CI described in the search warrant affidavit was merely a tipster who provided information to law enforcement. The CI was not an active participant in, or a witness to, the charged offense.

Mr. Navarrete-Rivera's reliance on *United States v. Hurse*, 453 F.2d 128 (8th Cir. 1971), is misplaced. In *Hurse*, an informant told police that he had purchased heroin from the defendant at the defendant's home and that the defendant had a sawed-off shotgun. *Id.* at 129. The court found that the identity of the informant was "vital to the integrity of the conviction" because probable cause to search the defendant's home was based solely on the informant's information, including that the defendant had a sawed-off shotgun in his possession, *id.* at 131, which was the offense charged.

The case before the Court is distinguishable for three reasons. First, it is not known whether the CI in this case witnessed the conduct forming the basis of the offense with which Mr. Navarrete-Rivera is charged (Possession with Intent to Distribute Controlled Substance on or about May 14, 2021). The affidavit relates only that the CI said Mr. Navarrete-Rivera "was involved in the sale and distribution of large quantities of methamphetamine . . . ." (Gov't Ex. 2 at 3–4.) The record before the Court does not exclude the possibility that the CI saw Mr. Navarrete-Rivera in possession of controlled substances on or about May 14, 2021. By contrast, the informant in *Hurse* saw the sawed-off shotgun in the defendant's possession, and the informant's report to police was the sole basis for

21

the search. Second, in the present case, the CI's information was not the only source of probable cause for the search. The positive dog sniff also provided probable cause. Third, the information from the CI in this case was at least partially corroborated by law enforcement. In *Hurse*, on the other hand, although the court referred to the informant as "reliable," there is no indication that any information was corroborated. *See* 453 F.2d at 131.

In sum, Mr. Navarrete-Rivera has not met his burden to show that disclosure of the CI would be material to his defense or essential to a fair determination of the charges against him. Therefore, the Court denies the motion to disclose the identity of the CI.

## III.    Order and Recommendation

Accordingly, **IT IS ORDERED** that Defendant Jose Ramone Navarrete-Rivera's Motion to Disclose Informant (Dkt. No. 19) is **DENIED**.

**IT IS FURTHER RECOMMENDED** that:

1. Defendant Jose Ramone Navarrete-Rivera's Motion to Suppress Evidence (Dkt. No. 21) be **DENIED**; and

2. Defendant Jose Ramone Navarrete-Rivera's Motion to Suppress Statements (Dkt. No. 22) be **DENIED**.


Date:  November 21, 2022          *s/     John F. Docherty*
                                  JOHN F. DOCHERTY
                                  United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).